**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GENEVA TRADING USA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JOHN ARENS,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br>Case No. 1:26-cv-12449<br><br><br>**JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Geneva Trading USA, LLC ("Geneva" or "Plaintiff"), by and through its undersigned attorneys, for its Complaint against Defendant John Arens ("Arens" or "Defendant"), alleges as follows. The allegations herein are made based on personal knowledge as to Geneva with respect to its own actions, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* ("DTSA"), and the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA"), and for breach of contract and breach of fiduciary duty under Illinois law, arising from Arens's blatant theft of Geneva's proprietary field-programmable gate array ("FPGA") source code on his final day of employment, as well as other confidential and proprietary information.

2. Geneva is a proprietary trading firm headquartered in Chicago, Illinois. Its business depends on proprietary trading software, trading strategies, and related technology, as well as bespoke software and hardware that facilitate its trading activities. Geneva invests considerable time, effort, and resources to develop and protect such intellectual property, which provides

Geneva a competitive advantage precisely because they are proprietary to Geneva and not known to or used by the public or by competitors.

3. Geneva hired Arens in August 2022 as a Senior FPGA Engineer and entrusted him as the primary architect of the FPGA solution it had already spent considerable resources building out. An FPGA is, at its most basic, a reprogrammable semiconductor chip that a proprietary trading firm like Geneva could configure at the hardware level to process market data and execute trades at ultra-fast speeds. In other words, it is a custom-built hardware circuit that allows Geneva to hardwire its trading strategy directly in order to bypass operating system overhead and latencies.

4. As a condition of his employment in this position entailing some of Geneva's utmost proprietary and valuable intellectual property, Arens signed a Restrictive Covenants Agreement in which he acknowledged that Geneva's source code and trading strategies constitute trade secrets and agreed never to use or disclose Geneva's Confidential Information for any purpose other than performing services for Geneva. Arens betrayed that trust in the gravest possible manner. On June 30, 2026—his last day of work and only hours before his system access was scheduled to end—Arens logged into Geneva's secure source code server, made a fresh, complete copy of Geneva's entire FPGA source code repository (including the repository's full development history, proprietary trigger-order data, and exchange connectivity configuration), compressed it into a single archive file, copied that archive to a personal external USB storage drive labeled "EXTREME SSD" (the "Drive"), and then deleted the local copies from his workstation to cover his tracks. The entire sequence took approximately ten minutes.

5. Arens had no legitimate business reason to copy Geneva's source code to a personal device on his way out the door. He already had a working copy of the code on his Geneva workstation; in the approximately nine months preceding his imminent departure he had never

used external storage on that workstation; and he was the only user across Geneva's fleet of hundreds of Linux hosts to copy an archive to removable media.

6. As Arens was well-aware, his data theft as conducted would not (and did not) trigger an immediate alert. The very nature of the FPGA tool, which was geared at eliminating latencies meant that Geneva could not employ standard data-loss-prevention software on the workstation used to develop and implement its FPGA code. Arens knew that by deleting the traces of his misconduct locally, Geneva likely would not be able to discover his misconduct. Arens also made sure that Geneva had no reason to regard him as a security risk because he had represented that he was retiring from working altogether because of vision issues. As a result, Arens's misappropriation indeed went undiscovered until recently, when Geneva was able to run an enhanced security review of the FPGA work system and happened to discover it. Geneva then promptly investigated and confirmed that Arens had exfiltrated the FPGA Repository, as well as other confidential and proprietary information, including information uploaded to his personal GitHub account.

7. Geneva brings this action to recover its property, to prevent Arens from using or disclosing its trade secrets, and to recover the damages caused by Arens's misconduct.

## THE PARTIES

8. Plaintiff Geneva Trading USA, LLC is a limited liability company organized under the laws of the State of Illinois, with its principal place of business at 190 South LaSalle Street, Suite 1800, Chicago, Illinois 60603. Geneva and its affiliates also maintain offices in Dublin and London.

9. Defendant John Arens is an individual who, upon information and belief, resides at 917 Leah Drive, Cary, IL 60013, in the State of Illinois. From approximately August 2022 until

June 30, 2026, Arens was employed by Geneva as a Senior FPGA Engineer in Geneva's Chicago office.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Count I arises under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* Section 1836(c) provides that the district courts of the United States have original jurisdiction of civil actions brought under the DTSA.

11. This Court has supplemental jurisdiction over Geneva's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Geneva's federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

12. This Court has personal jurisdiction over Arens because, upon information and belief, he resides and is domiciled in Illinois, and because the wrongful conduct alleged herein—including the copying of Geneva's source code onto a personal storage device—occurred at Geneva's Chicago office in this District. Arens's wrongful conduct arises out of and is related to the tortious acts he committed in this State and District.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because, upon information and belief, Arens resides in this District, and because a substantial part of the events and omissions giving rise to Geneva's claims occurred in this District, where Geneva's trade secrets were developed and maintained and from which they were taken.

14. Venue in this Court is also proper by agreement of the parties. In Section 16 of the Restrictive Covenants Agreement, Arens agreed that "any legal action concerning the enforcement or interpretation of this Agreement or relating in any way to the relationship between the parties

shall be instituted in a state or federal court in the County of Cook, State of Illinois and such venue shall be deemed appropriate by agreement of the parties." This Court sits in Cook County, Illinois.

## FACTUAL BACKGROUND

### A. Geneva's Business and Its Proprietary FPGA Trading Technology

15. Geneva is engaged in the business of developing software, trading platforms, strategies, and other intellectual property related to trading, as well as the active trading, directly and indirectly, of futures, securities, commodities, and other financial instruments.

16. Geneva owns proprietary, trade secret trading software applications and unique trade secret trading strategies and related technology used to facilitate its trading activity. Geneva has expended considerable time, effort, and resources to acquire, develop, maintain, and protect this technology.

17. Among Geneva's most valuable and important intellectual property assets is its FPGA source code, maintained in a repository on Geneva's internal, password-protected Bitbucket source code server under the name "fpga/codebase" (the "FPGA Repository"). FPGAs are specialized hardware devices that can be programmed to execute trading logic with extremely low latency. In other words, FPGAs generally enable traders to execute certain highly time-sensitive trading functions quicker and more reliably, with less risk. Highly-tailored FPGAs are integral to a trading firm's success, and trading firms like Geneva spend millions of dollars developing them and continuously upgrading and tailoring them. The FPGA Repository contains the source code, configuration files, scripts, and associated data that Geneva uses to build out this capability.

18. The FPGA Repository is a team work product. It contains multiple development branches reflecting the work of numerous Geneva engineers, together with the complete version history of the code.

19. The FPGA Repository includes, among other things: (a) proprietary trigger-order data for Geneva's proprietary trading activity; (b) Geneva's market data channel configuration; (c) scripts used to connect to the secure file transfer protocol ("SFTP") to its derivatives marketplaces; and (d) dozens of additional proprietary source code and script files (collectively, together with the remainder of the FPGA Repository, the "FPGA Trade Secrets", and together with the proprietary information described in paragraphs 48 through 50 below, the "Trade Secrets").

20. The FPGA Trade Secrets are not broad areas of technology or general engineering know-how. They consist of concrete, specific materials, including: (a) the particular source code, scripts, and configuration files that implement Geneva's FPGA-based trading logic; (b) the specific trigger-order parameters for Geneva's trading activity; (c) the specific market data channel configuration that Geneva selected and implemented; (d) the specific automated process by which Geneva connects to its derivative marketplace's SFTP server to obtain security definition data for use in Geneva's trading; and (e) the complete commit and version history of the FPGA Repository, which reflects the iterative design choices and tested approaches of Geneva's engineers. None of these materials is publicly available, and they cannot be derived from publicly available information about FPGAs or exchange protocols.

21. The FPGA Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from their disclosure or use, including competing trading firms and FPGA developers. The FPGA Trade Secrets embody years of engineering effort and investment, and would allow a competitor to replicate Geneva's hardware trading capability and trading logic without incurring the time and expense Geneva incurred to develop them.

22. Geneva's FPGA Trade Secrets are used in, and intended for use in, interstate and foreign commerce, including in connection with Geneva's electronic trading on exchanges in the United States and abroad.

23. Geneva has expended millions of dollars over the course of more than four years to develop the FPGA Trade Secrets.

**B. Geneva Takes Reasonable Measures to Protect Its Trade Secrets**

24. Geneva takes reasonable measures to keep its Trade Secrets secret. Among other things, Geneva requires each of its employees, as a condition of employment, to execute a Restrictive Covenants Agreement containing confidentiality, non-use, non-disclosure, return-of-property, and ownership-of-developments obligations.

25. Geneva restricts access to the FPGA Repository and other code to authorized personnel, stores it on an internal source code server that requires individual credentials and password authentication, and maintains audit logs of access to, and cloning of, the repository.

26. Geneva designates the FPGA Repository as one of a limited number of sensitive source code repositories subject to heightened oversight.

27. Geneva further protects its systems through individual user accounts managed through Geneva's identity and access management systems, endpoint detection and monitoring software on its workstations, and the disabling of departing employees' system access upon separation.

28. Geneva also requires its employees to abide by its policies and procedures, including those set forth in its Employee Handbook, and marks its electronic communications as proprietary and confidential.

**C. Arens's Employment and His Contractual Obligations to Geneva**

29. On August 4, 2022, Geneva extended to Arens a written offer of full-time employment as a Senior FPGA Engineer in Geneva's Chicago office, reporting directly to Geneva's Chief Software Engineer (the "Offer Letter"). Arens accepted the Offer Letter by signing it on August 11, 2022. A true and correct copy of the Offer Letter is attached hereto as Exhibit A.

30. The Offer Letter provided Arens an annual salary of $250,000, the opportunity to participate in Geneva's Performance Bonus Plan, and eligibility for an incentive bonus of up to $50,000 upon completion of a milestone within twelve months of his start date: "Complete functionality of a scalable hardware solution and execution of trade(s)."

31. Arens was hired specifically to develop, tailor, and implement the hardware trading technology embodied in the FPGA Repository. Indeed, Arens was to set up a lab, set up "the core IP components, Python testing framework, and unit tests," and "[b]uild out a trading strategy."

32. In the Offer Letter, Arens agreed "to abide by all Geneva policies and procedures, including those set forth in our Employee Handbook," and acknowledged that, "[a]s a condition of employment with Geneva, [he] will sign and abide by a Restrictive Covenants Agreement."

33. On August 11, 2022, in consideration of his employment and his access to Geneva's Confidential Information and specialized training, Arens executed the Geneva Trading USA, LLC Restrictive Covenants Agreement (the "RCA"). Geneva executed the RCA on August 5, 2022. A true and correct copy of the RCA is attached hereto as Exhibit B.

34. In the RCA, Arens expressly acknowledged that Geneva's business "is specialized and any documents and information regarding the Confidential Information . . . are highly confidential and constitute trade secrets." (Ex. B § 2(a).)

35. Arens further acknowledged that Geneva owns "proprietary, trade secret trading software applications" and "unique trade secret trading strategies, related technology techniques,

and relationships," that these assets "provide the Company with a competitive advantage and are not generally available to the public or known within the trading industry," and that "the success of the Company depends on the Applications, Company source code, and Intellectual Property remaining proprietary and confidential." (Ex. B § 2(b).)

36. The RCA defines "Confidential Information" to include, without limitation, "any confidential or proprietary information, observation, or data, in whatever form or medium, concerning the business or affairs of Company or any of its affiliates, including, without limitation, trading systems and methodology, concepts and strategies, records, computer software, methods of operation, financial information, business strategies, and other trade secrets or information of whatever nature." (Ex. B § 3(a)(i).)

37. In Section 3(b) of the RCA, Arens agreed to "hold all Confidential Information in the strictest confidence" and not, "during or after the termination of [his] employment," to "(i) disclose or make use of the Confidential Information for any purpose whatsoever other than the performance of services to the Company or its affiliates, or (ii) disclose to any person or entity or use for [his] account or benefit or for the account or benefit of others, directly or indirectly, any Confidential Information." Arens further agreed that, "[u]pon Company's request, [he] shall cease use of and deliver to Company all Confidential Information in tangible form that Associate may have in the Associate's possession or control." (Ex. B § 3(b).)

38. In Section 4 of the RCA, Arens agreed that all developments and improvements he conceived or developed during his employment within the scope of Geneva's business "shall be conclusively presumed to have been created for or on behalf of the Company," that any materials he prepared would be "work made for hire" that "shall become part of the Confidential

Information," and he assigned to Geneva "all rights to such work and all Developments." (Ex. B § 4.)

39. Section 3(e) of the RCA notified Arens of the immunity provided under 18 U.S.C. § 1833(b) for confidential disclosures of trade secrets to government officials or attorneys for the purpose of reporting or investigating a suspected violation of law, or in sealed court filings. (Ex. B § 3(e).)

40. In Section 10 of the RCA, Arens represented and warranted that he was familiar with the trade secret and confidentiality terms of the RCA, that the obligations and remedies described in the RCA—"including, without limitation, the right to equitable relief"—are reasonable, and that the covenants and restrictions contained in the RCA are "fair, reasonable, and just, under the circumstances." (Ex. B § 10.)

41. In Section 11 of the RCA, Arens agreed that any breach or threatened breach "will cause irreparable injury to Company and that money damages alone may not prove adequate remedy," that Geneva is entitled to have the RCA specifically enforced, that Geneva may require Arens "to account for and pay over to Company all compensation, profits, monies, accruals, increments or other benefits derived or received by Associate as the result of any transactions constituting a breach," and that Arens "shall reimburse Company for all reasonable attorneys' fees, costs and expenses incurred by Company in enforcing this Agreement." (Ex. B § 11.)

42. The RCA survives the termination of Arens's employment, and its non-disclosure obligations "shall be extended by the length of time during which Associate shall have been in breach." (Ex. B preamble, §§ 1, 12.) The RCA is governed by Illinois law. (Ex. B § 16.)

43. By virtue of his position as a Senior FPGA Engineer, Arens had access to, worked extensively with, and was intimately familiar with the FPGA Repository and the FPGA Trade

Secrets and related proprietary information as described below. Arens created and maintained his own development branch of the FPGA Repository beginning in March 2026, and he committed the trigger-order file to that branch in May 2026. Arens therefore knew the content and value of the FPGA Trade Secrets.

44. Geneva's records show that Arens personally made every one of the eleven sets of changes saved to his own working version of the FPGA Repository, which was named "feature/hit_leaner." Arens therefore wrote and controlled that working version, including the trigger-order file saved in it, and knew what it contained. By contrast, the complete copy of the FPGA Repository that Arens made on June 30, 2026, described below, is the only time Geneva's records show him making a full copy of any of Geneva's FPGA code collections.

**D. Arens Prepares to Leave Geneva**

45. Upon information and belief, on March 18, 2026, Arens used special administrator-level powers on a Geneva computer shared by several employees to move a coworker's file, a recording of network data, out of that coworker's personal folder, and then copied the file to his own computer.

46. In or around April 2026, Arens represented to Geneva that he intended to retire.

47. Notwithstanding his stated intention to retire, on May 5, 2026, Arens viewed a job posting for a "senior FPGA/ASIC designer" position at Orthogone, an FPGA design vendor based in Montreal, Canada.

48. In his final weeks at Geneva, Arens gathered additional trading data onto his computer. On May 20, 2026 and June 2, 2026, he downloaded from coworkers files containing Geneva's trigger-order data, which are instructions telling Geneva's systems when to place trades. On June 22, 2026, he downloaded from a coworker's shared folder recordings of trading data from

the Chicago Mercantile Exchange ("CME"). Upon information and belief, the trigger-order data that Arens had saved into the FPGA Repository as a file named "leans.csv" was among the materials he later copied into the Archive. These downloads, all within his last forty days at Geneva, show a deliberate pattern of gathering Geneva's confidential trading data.

49. Beginning on or about June 22, 2026, Arens began assembling a personal collection of his workstation configuration files to take with him. On June 25, 2026, Arens pushed a repository of those configuration files (commonly known as "dotfiles") from his Geneva workstation to a personal GitHub account, "johnarens/dotfiles." That repository included secure shell (SSH) configuration data and encrypted access tokens, including a GitHub personal access token and an Atlassian-format access token.

50. As he prepared to take his computer settings with him, on June 22, 2026, Arens made a list of all the software programs installed on his Geneva computer and of the digital security keys stored on it. On June 24, 2026, he listed every settings folder on that computer, including the folders for the 1Password password manager, Google's cloud services, and GitHub. Upon information and belief, the Drive already held a file named "globalprotect-vpn.pdf," which may be a Geneva guide for connecting to Geneva's computer network from outside the office.

51. On June 24, 2026, Geneva's Human Resources department circulated an internal communication confirming Arens's termination date. On June 29, 2026, Geneva sent Arens an "Employee Exit Interview" email.

52. Also on June 29, 2026, Arens connected the Drive to his Geneva workstation, where it remained connected for approximately four hours and fourteen minutes, and executed a command to copy his dotfiles collection to the Drive.

53. Geneva's records connect Arens personally to the June 29 Drive session. That day, Arens's mobile phone was connected to the internet through Geneva's office network, and Arens logged in from his Geneva computer using both his password and the Microsoft Authenticator app, a security app that confirms a person's identity through his phone.

54. On the evening of June 29, 2026, Geneva's Human Resources department uploaded Arens's separation letter and sent Arens a calendar invitation for an "Exit Discussion."

### E. On His Last Day, Arens Copies the Entire FPGA Repository to the Drive and Deletes the Local Copies

55. On the morning of June 30, 2026, Arens's final day of employment, Arens unlocked his Geneva Linux workstation (host name "chilwd004") at Geneva's Chicago office using his password at approximately 8:09 a.m. Central Daylight Time ("CDT"). (All times below are CDT.)

56. At approximately 8:13 a.m., Arens logged into the web interface of Geneva's Bitbucket source code server using his password and, at approximately 8:14 a.m., viewed his "feature/hit_leaner" branch of the FPGA Repository.

57. Arens then created a new directory on his workstation titled "backup." At approximately 8:17 a.m., Arens connected to Geneva's Bitbucket server over a secure shell (SSH) connection and cloned the entire FPGA Repository into that directory, creating a fresh, complete copy of the repository, including every development branch and its full version history. Geneva's Bitbucket server logged the clone from Arens's workstation, recording "Repository cloned" at approximately 8:17 a.m. It is the only clone of any FPGA project repository by Arens reflected in the server's audit records. Arens then switched to his "feature/hit_leaner" branch and pulled its latest contents.

58. Arens had no prior history of cloning the FPGA Repository. Check-ins of code to the FPGA Repository were typically handled by other members of Geneva's FPGA engineering

team. Arens's clone of the FPGA Repository on his final day of employment was therefore a marked departure from his ordinary pattern of work.

59. After an unsuccessful first attempt to compress the copied repository, Arens consulted help pages for compression utilities and, at approximately 8:21 a.m., compressed the entire copied FPGA Repository into a single archive file titled "codebase.tar.gz," 5,631,288 bytes in size (the "Archive").

60. At approximately 8:21 a.m., after the Archive was complete, Arens connected the Drive to his workstation. At approximately 8:22 a.m., Arens copied the Archive to a folder titled "gt" on the Drive. The Drive was connected for approximately 71 seconds and then unmounted and removed.

61. Immediately after copying the Archive, and while the Drive was still plugged in, Arens twice opened the "gt" folder on the Drive and checked which version of the file-compression program was installed on his computer. Shortly afterward, he tried to display a list of the Archive's contents, but the command he typed did not work. This conduct shows that Arens almost certainly confirms he checked the copy he had made, a strong indication that the copy was not an accident.

62. The Drive is Arens's personal device. Geneva's forensic records reflect that the Drive contained personal estate planning documents bearing the names of Arens and his wife. Arens's password was used to unlock the workstation, and Arens's user account executed each step of the clone, compression, copy, and deletion sequence described herein.

63. At approximately 8:23 a.m., less than two minutes after copying the Archive to the Drive, Arens executed a command that permanently deleted the "backup" directory, including both the cloned copy of the FPGA Repository and the local copy of the Archive, from his workstation.

64. The Archive copied to the Drive contained a complete copy of the FPGA Repository, including Arens's "feature/hit_leaner" branch, the branches and work of his colleagues, and the full development history of the code. Upon information and belief, the Archive contained, among other things, the trigger-order data, the channel configuration data, and the SFTP script. Geneva's monitoring records reflect that at least 27 script files were written into the copy.

65. The Archive also contains material Geneva uses to connect to the exchange, along with related login information. Among other things, it contains a program named "daily_secdef.py" that automatically logs into the CME's secure file-transfer server, and the password for that CME account was typed in plain, unprotected text in commands on Arens's Geneva computer. In addition, the collection of computer settings that Arens uploaded to his personal GitHub account included two digital access keys, which work like passwords: one for GitHub and one in the format used by Atlassian, the company that makes Bitbucket.

66. At approximately 9:56 a.m. that same morning, Arens deleted Geneva's "Exit Discussion" calendar invitation without responding to it.

67. At approximately 11:29 a.m. that same day, after he had copied the Archive to the Drive, Arens opened previews of two files belonging to his coworkers, titled "FPGA Trade Summary Triggering.docx" and "Co-ordinated event behavior.xlsx."

68. Arens did not disclose to Geneva that he had copied the FPGA Repository to the Drive, and he did not return the Drive or the Archive to Geneva upon his departure.

69. Geneva disabled Arens's system access through its routine human resources offboarding process later that afternoon, approximately eight hours after Arens copied the Archive to the Drive.

### F. Arens Had No Legitimate Reason to Take Geneva's Source Code

70. Arens had no legitimate business purpose for copying the FPGA Repository to the Drive on his last day of employment. Arens was departing Geneva and would no longer perform services for Geneva, supposedly to retire. Arens already had an existing working copy of the FPGA Repository on his Geneva workstation, which he did not need to replicate to perform any Geneva work.

71. In the approximately nine months preceding June 29, 2026, Arens had never used external storage on his Geneva workstation. Across Geneva's entire fleet of hundreds of Linux hosts, Arens was the only user to copy an archive file to removable media.

72. Arens was never authorized by Geneva to remove the FPGA Repository, the Archive, or any portion of the FPGA Trade Secrets from Geneva's systems or premises, or to retain them following the end of his employment. Arens's access to the FPGA Repository was authorized solely for the purpose of performing services for Geneva.

73. Arens's conduct—copying the entire repository rather than any discrete file, compressing it into a single file before connecting the Drive, transferring it to the Drive in a matter of seconds, and immediately deleting the local copies—demonstrates that Arens knew he was taking Geneva's Trade Secrets without authorization and sought to avoid detection.

### G. Geneva Discovers the Theft and Arens Remains in Possession of Geneva's Trade Secrets

74. Recently, Geneva identified the covert exfiltration using an enhanced data-loss-prevention investigation tool it was able to implement on the FPGA workstation. Geneva promptly conducted a forensic investigation of Arens's activity on Geneva's systems, which revealed the conduct described above.

75. Geneva sent Arens a cease and desist and demand letter on October 8, 2026 (via email and express mail with delivery confirmed) which demanded, among other things, that Arens return the Drive and all copies of Geneva's Confidential Information and remedy the consequences of his unlawful conduct. A true and correct copy of the cease and desist letter is attached hereto as Exhibit C. As of the time of filing, the parties could not reach an agreement on the scope of relief and a plan for remediation.

76. In responding to Arens's unauthorized access and exfiltration, Geneva has already incurred substantial costs, including the costs of: (a) conducting a forensic investigation of Arens's workstation activity and of the audit records of Geneva's Bitbucket source code server; (b) assessing the scope of the data taken and the resulting damage to the integrity and security of Geneva's systems and data; (c) preparing an incident analysis and evidence packet; and (d) restoring and strengthening the security of its systems, including by configuring new detection rules for file movements to removable media on Linux workstations and for first-time repository clones, and deploying additional data-protection software to its FPGA development workstations.

77. Upon information and belief, Arens remains in possession, custody, or control of the Drive and the Archive containing Geneva's Trade Secrets. Geneva has not recovered the Drive, and the location of the Archive and any further copies of it are unknown.

78. Upon information and belief, Arens took the Trade Secrets to use them for his own benefit or the benefit of others, including in connection with future employment or engagement in the FPGA or trading industry, in which he has sought opportunities.

79. Upon information and belief, Arens's continued possession of the Trade Secrets poses an ongoing and imminent threat that they will be used or disclosed to Geneva's detriment. Any use or disclosure of the Trade Secrets would destroy their secrecy and the competitive

advantage they provide Geneva, and would cause Geneva irreparable harm for which there is no adequate remedy at law.

80. All conditions precedent to the claims asserted herein have been performed, have occurred, or have been waived or excused.

## COUNT I

### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)

81. Geneva incorporates and re-alleges each and every allegation in paragraphs 1 through 80 above as if fully set forth herein.

82. Geneva is the owner of the Trade Secrets, including the FPGA Repository and the source code, trigger-order data, exchange connectivity configuration, scripts, and development history contained therein, as described herein. The Trade Secrets constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

83. The Trade Secrets are identified with particularity in paragraphs 17 through 20 and 48 through 50 above. They consist of specific source code, trigger-order data, exchange connectivity configuration, scripts, and development history, as distinguished from general knowledge, skill, and experience in FPGA engineering or electronic trading.

84. The Trade Secrets relate to products and services used in, or intended for use in, interstate and foreign commerce, including Geneva's electronic trading on exchanges in the United States and abroad.

85. Geneva has taken reasonable measures to keep the Trade Secrets secret, including by requiring employees to execute confidentiality agreements such as the RCA, restricting access to the FPGA Repository and other proprietary information to authorized personnel through credentialed and password-protected systems, designating the FPGA Repository as a sensitive

repository subject to heightened oversight, monitoring and logging access to its systems, and disabling departing employees' access.

86. The Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.

87. Arens acquired knowledge of and access to the Trade Secrets in the course of his employment with Geneva, under circumstances giving rise to a duty to maintain their secrecy and limit their use, including under the RCA and his duties as a Geneva employee.

88. Arens misappropriated the Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by, among other things, acquiring the Trade Secrets by improper means—including theft and breach of his duty to maintain secrecy—when he copied the entire FPGA Repository to the Drive without authorization on his final day of employment, and by retaining the Trade Secrets after his employment ended. Upon information and belief, Arens has used or disclosed, or threatens to use or disclose, the Trade Secrets without Geneva's express or implied consent.

89. Upon information and belief, Arens took the Trade Secrets to use them in his own business or in the business of others, including in connection with his pursuit of employment or engagement in FPGA design, such as the senior FPGA/ASIC designer position at Orthogone that he viewed on May 5, 2026. Arens copied the entire FPGA Repository—not any personal file—onto a personal device and retained it after his employment ended, and he had no use for the Trade Secrets other than to exploit them outside Geneva.

90. Arens knew or had reason to know that the Trade Secrets were acquired by improper means and that he owed Geneva a duty to maintain their secrecy and limit their use.

91. Arens's misappropriation was willful and malicious. Arens deliberately copied the entire FPGA Repository to a personal device hours before his access ended, immediately deleted the local copies, and concealed his conduct from Geneva.

92. Geneva provided Arens with notice of the immunity set forth in 18 U.S.C. § 1833(b) in Section 3(e) of the RCA, and Geneva is therefore entitled to recover exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C) and (D).

93. As a direct and proximate result of Arens's misappropriation, Geneva has suffered and will continue to suffer damages, and Arens has been or will be unjustly enriched, in an amount to be proven at trial. Geneva is entitled to damages for its actual loss and for any unjust enrichment not addressed in computing actual loss, or, in the alternative, a reasonable royalty, pursuant to 18 U.S.C. § 1836(b)(3)(B).

94. Arens's actual and threatened misappropriation has caused and, unless enjoined, will continue to cause Geneva imminent and irreparable harm for which Geneva has no adequate remedy at law. Geneva is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A), including an order requiring Arens to return the Drive, the Archive, and all copies of the Trade Secrets and prohibiting any use or disclosure of the Trade Secrets.

## COUNT II

## Misappropriation of Trade Secrets Under the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.*)

95. Geneva incorporates and re-alleges each and every allegation in paragraphs 1 through 80 above as if fully set forth herein.

96. The Trade Secrets constitute "trade secrets" within the meaning of 765 ILCS 1065/2(d) because they are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure

or use, and because they are the subject of efforts that are reasonable under the circumstances to maintain their secrecy or confidentiality, as described in paragraphs 24 through 28 above.

97. Arens misappropriated the Trade Secrets within the meaning of 765 ILCS 1065/2(b) by acquiring them through improper means, including theft and breach of his duty to maintain their secrecy, and, upon information and belief, by using or disclosing them, or threatening to use or disclose them, without Geneva's express or implied consent, when he knew or had reason to know that the Trade Secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

98. Upon information and belief, Arens acquired and retained the Trade Secrets to use them in his own business or in the business of others, as alleged in paragraph 89 above.

99. Arens's actual and threatened misappropriation has caused and, unless enjoined, will continue to cause Geneva irreparable harm for which it has no adequate remedy at law. Geneva is entitled to injunctive relief pursuant to 765 ILCS 1065/3, including affirmative acts to protect the Trade Secrets.

100. As a direct and proximate result of Arens's misappropriation, Geneva has suffered damages, and Arens has been or will be unjustly enriched, in an amount to be proven at trial. Geneva is entitled to recover damages for its actual loss and the unjust enrichment caused by the misappropriation, or, in the alternative, a reasonable royalty, pursuant to 765 ILCS 1065/4(a).

101. Arens's misappropriation was willful and malicious, entitling Geneva to exemplary damages pursuant to 765 ILCS 1065/4(b) and to its reasonable attorneys' fees pursuant to 765 ILCS 1065/5.

## COUNT III

### Breach of Contract — Restrictive Covenants Agreement

102. Geneva incorporates and re-alleges each and every allegation in paragraphs 1 through 80 above as if fully set forth herein.

103. The RCA is a valid and enforceable contract between Geneva and Arens, supported by adequate consideration, including Arens's employment, his compensation, and his access to Geneva's Confidential Information and specialized training. The confidentiality, non-use, return-of-property, and ownership-of-developments obligations in the RCA are reasonable and necessary to protect Geneva's legitimate business interests in its trade secrets and Confidential Information.

104. Geneva substantially performed, and in fact fully performed, all of its obligations under the RCA, including by employing and compensating Arens and providing him access to its Confidential Information.

105. Arens breached the RCA by, among other things: (a) failing to hold Geneva's Confidential Information in the strictest confidence, in violation of Section 3(b); (b) making use of Geneva's Confidential Information for a purpose other than the performance of services to Geneva, including by copying the FPGA Repository to the Drive, in violation of Section 3(b); (c) upon information and belief, using or disclosing, or threatening to use or disclose, Geneva's Confidential Information for his own benefit or the benefit of others, in violation of Sections 3(b) and 3(c); (d) failing to cease use of and deliver to Geneva all Confidential Information in his possession or control, in violation of Section 3(b); and (e) retaining and exercising dominion over Developments and work product that belong exclusively to Geneva, in violation of Section 4.

106. As a direct and proximate result of Arens's breaches, Geneva has suffered and will continue to suffer damages in an amount to be proven at trial, including but not limited to the costs

of investigating and responding to Arens's misconduct described in paragraph 76 above and the diminution in value of its Confidential Information.

107. Arens agreed in Section 11 of the RCA that any breach or threatened breach would cause Geneva irreparable injury for which money damages may not be adequate, and that Geneva is entitled to specific enforcement of the RCA. Geneva is entitled to specific performance and injunctive relief requiring Arens to comply with the RCA and to return all of Geneva's Confidential Information.

108. Pursuant to Section 11 of the RCA, Geneva is further entitled to an accounting and disgorgement of all compensation, profits, monies, or other benefits derived or received by Arens as a result of his breaches, and to reimbursement of all reasonable attorneys' fees, costs, and expenses incurred in enforcing the RCA.

## COUNT IV

### Breach of Fiduciary Duty — Duty of Loyalty

109. Geneva incorporates and re-alleges each and every allegation in paragraphs 1 through 80 above as if fully set forth herein.

110. As a Geneva employee entrusted with access to Geneva's most sensitive proprietary technology, Arens held a position of trust and confidence with Geneva and owed Geneva a fiduciary duty of loyalty, including the duty to act in Geneva's best interests, to refrain from using Geneva's property and resources for his own benefit, and to refrain from taking actions contrary to Geneva's interests during his employment.

111. Arens breached his fiduciary duty of loyalty while still employed by Geneva by, among other things: (a) representing to Geneva that he intended to retire while, upon information and belief, pursuing employment in the FPGA design industry, including the Orthogone position

he viewed on May 5, 2026; (b) transferring workstation configuration files, SSH configuration data, and access tokens, including an Atlassian-format access token, to a personal GitHub account and the Drive; (c) abusing his position of trust to copy Geneva's entire FPGA Repository to a personal storage device for his own benefit; (d) destroying the local copies of the materials he took in order to conceal his conduct; (e) avoiding Geneva's scheduled exit discussion by deleting the invitation without response; and (f) failing to disclose his conduct to Geneva.

112. This Count is pleaded in the alternative to Counts I and II to the extent that any of the information Arens took is determined not to constitute a trade secret, and is based on Arens's breach of his duty of loyalty independent of any misappropriation of trade secrets, including the conduct described in subparagraphs (a), (b), (c), (f), and (g) of paragraph 111 above.

113. Arens acted willfully, with fraud, malice, and in conscious disregard of Geneva's rights.

114. As a direct and proximate result of Arens's breaches of his fiduciary duty, Geneva has suffered damages in an amount to be proven at trial, and Geneva is entitled to compensatory damages, disgorgement and forfeiture of compensation paid to Arens during the period of his disloyalty, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Geneva Trading USA, LLC respectfully requests that this Court enter judgment in its favor and against Defendant John Arens on all Counts, and grant the following relief:

A. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Arens, and all persons acting in concert or participation with him, from accessing, using, disclosing, copying, transferring, or otherwise exploiting

Geneva's Trade Secrets and Confidential Information pursuant to 18 U.S.C. § 1836(b)(3)(A), 765 ILCS 1065/3, and Section 11 of the RCA;

B. An order requiring Arens to immediately return to Geneva, or to Geneva's designated forensic examiner, the Drive, the Archive, and every other device, account, or medium containing any copy or portion of the FPGA Repository or Geneva's Confidential Information, and thereafter to certify under oath the permanent destruction of any remaining copies;

C. An order requiring Arens to submit his personal computers, storage devices, and cloud, email, and code-hosting accounts (including his personal GitHub and Gmail accounts) utilized since March 1, 2026 to forensic inspection to identify, recover, and remediate Geneva's Trade Secrets and Confidential Information;

D. An order requiring Arens to identify under oath every person or entity to whom he has disclosed, transferred, or provided access to any of Geneva's Trade Secrets or Confidential Information;

E. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Arens from altering, destroying, deleting, or disposing of any evidence relating to this action, including electronic devices, storage media, accounts, documents, and metadata;

F. Specific performance of the RCA;

G. An award of compensatory damages in an amount to be proven at trial, including damages for Geneva's actual loss and Arens's unjust enrichment or, in the alternative, a reasonable royalty;

H. An accounting and disgorgement of all compensation, profits, monies, or other benefits derived or received by Arens as a result of his wrongful conduct, and forfeiture of compensation paid to Arens during the period of his disloyalty;

I. An award of exemplary damages of up to two times the amount of compensatory damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and 765 ILCS 1065/4(b);

J. An award of punitive damages on Count IV in an amount sufficient to punish Arens and deter similar conduct;

K. An award of Geneva's reasonable attorneys' fees, costs, and expenses pursuant to 18 U.S.C. § 1836(b)(3)(D), 765 ILCS 1065/5, and Section 11 of the RCA, to the extent permitted by law;

L. An award of pre-judgment and post-judgment interest as allowed by law; and

M. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Geneva demands a trial by jury on all issues so triable.

Dated: October 9, 2026

Respectfully submitted,

**GENEVA TRADING USA, LLC**

By: Jeannil Boji
One of Its Attorneys

Jeannil Boji
Christopher Lepore
AKERMAN LLP
71 South Wacker Drive
47th Floor
Chicago, IL 60606
Telephone: 312.634.5700

jeannil.boji@akerman.com
christopher.lepore@akerman.com

*Attorneys for Plaintiff*
*Geneva Trading USA, LLC*

# VERIFICATION

I, Tomas Filip, declare as follows:

1. I am the Director of Security of Geneva Trading USA, LLC ("Geneva"), and I am authorized to make this verification on Geneva's behalf.

2. I have read the foregoing Verified Complaint. The factual allegations concerning Geneva and its own actions are true and correct based on my personal knowledge, and the remaining factual allegations are true and correct to the best of my knowledge, information, and belief, formed after reasonable inquiry, including my review of Geneva's business records and the records of Geneva's information security investigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Executed on October 9, 2026 in Chicago, Illinois.

By: ______________________________
Tomas Filip

Title: Director of Security

GENEVA TRADING

190 SOUTH LASALLE STREET
SUITE 1800
CHICAGO, ILLINOIS 60603
PHONE: 312-471-6100

August 4, 2022

John Arens
John.w.arens@gmail.com

John,

Geneva Trading USA, LLC is pleased to extend to you an offer of full-time employment as Senior FPGA Engineer in our Chicago office, located at 190 South LaSalle Street, Suite 1800.

**Start Date:** Your hire date will be a mutually agreed upon date. This offer is contingent upon a satisfactory background check.

**Reporting Structure:** You will report directly to Aman Gebredehan, Chief Software Engineer.

**Compensation**:

- **Salary:** You will be paid monthly at an annual salary rate of $250,000.
- **Annual Bonus:** You will have the opportunity to participate in our Performance Bonus Plan. Bonuses under this Plan are paid annually and are based on your individual performance as well as the profitability of the Company.
- **Incentive Bonus:** In addition to the annual bonus, you will be eligible to receive an incentive bonus up to the amount of $50,000 upon completion of the following milestone within twelve months of your start date. Your manager will determine whether the relevant Company milestone has been achieved.
    - **Milestone:** Complete functionality of a scalable hardware solution and execution of trade(s)
        - **Project Timeline:**
            - Three months: Setup lab to define and understand problem
            - Three months: Setup the core IP components, Python testing framework, and unit tests
            - Six months: Build out a trading strategy
            - 12 months: Completion of milestone

**Benefits:** You will be eligible to receive the employee benefits offered by Geneva Trading to all full-time employees. Company benefits, including group medical, dental, vision, long-term disability and life insurance and a retirement savings plan, will be described in detail during your orientation. You will be eligible for twenty (20) PTO days annually and will accrue monthly.

**Agreements:** For purpose of clarity, your employment with Geneva Trading USA, LLC is at-will. As an employee of Geneva Trading USA, LLC you agree to abide by all Geneva policies and procedures, including those set forth in our Employee Handbook. As a condition of employment with Geneva, you will sign and abide by a Restrictive Covenants Agreement. If you have any questions regarding these policies, please contact the Human Resources department as soon as possible.

**Acceptance:** To show your acceptance of this Offer of Employment, please sign this letter as well as the attached Restrictive Covenants Agreement and Employment Agreement and send it to the Human Resources Department.

We would be delighted to welcome you to Geneva Trading USA, LLC! We're confident you'll find great success in your new role.

Sincerely,

Robert Creamer
President and CEO

**EXHIBIT A**

DocuSign Envelope ID: 673E9F2E-3055-49C8-83BA-E5312D419196


GENEVA TRADING

190 SOUTH LASALLE STREET
SUITE 1800
CHICAGO, ILLINOIS 60603
PHONE: 312-471-6100

Accepted by:

8/11/2022

John Arens Date

**GENEVA TRADING USA, LLC**
**RESTRICTIVE COVENANTS AGREEMENT**

**THIS AGREEMENT BETWEEN THE UNDERSIGNED ("ASSOCIATE") AND GENEVA TRADING USA, LLC ("COMPANY") IS IN CONSIDERATION OF ASSOCIATE'S AFFILIATION WITH THE COMPANY. ASSOCIATE UNDERSTANDS THAT WHILE HIS OR HER AFFILIATION MAY BE TERMINATED AT WILL BY EITHER THE ASSOCIATE OR THE COMPANY, THIS AGREEMENT SHALL SURVIVE TERMINATION OF SUCH AFFILIATION. THE PARTIES AGREE THAT FOR PURPOSES OF THIS AGREEMENT "COMPANY" SHALL BE DEEMED TO INCLUDE ANY PARENT, SUBSIDIARY OR AFFILIATE OF THE COMPANY. THE PARTIES FURTHER AGREE THAT "ASSOCIATE" MEANS ANY NATURAL PERSON WORKING AT THE COMPANY IN THE CAPACITY OF (i) TRADER, (ii) NON-TRADER (iii) MEMBER OF THE COMPANY OR ITS AFFILIATE WHO IS ENGAGED IN TRADING OR (iv) IN ANY OTHER CAPACITY AS AN EMPLOYEE OR NON-EMPLOYEE CONSULTANT.**

1. **Effective Date.** This Agreement is effective as of the Associate's start date. Specific obligations under this Agreement shall continue after the date on which the Associate may cease to be employed by or otherwise affiliated or associated with the Company when necessary to carry out the intent of this Agreement.

2. **Acknowledgments**. Associate acknowledges that:

(a) Company is engaged in the business of developing software, trading platforms, strategies, and other intellectual property related to the trading and support as well as the active trading, directly and indirectly, of futures, securities, commodities, and other financial instruments ("Business"). The Business is specialized and any documents and information regarding the Confidential Information (as defined below) are highly confidential and constitute trade secrets.

(b) Company owns proprietary, trade secret trading software applications (the "Applications"), has expended considerable time, effort and resources to acquire, develop, maintain and protect the Applications and unique trade secret trading strategies, related technology techniques, and relationships, (the "Intellectual Property"), and may trade using the Intellectual Property electronically on exchanges globally. The Applications and Intellectual Property provide the Company with a competitive advantage and are not generally available to the public or known within the trading industry. The Parties acknowledge and agree that the success of the Company depends on the Applications, Company source code, and Intellectual Property remaining proprietary and confidential, and that disclosure of the Intellectual Property, the unique features of the Applications, or other confidential information of the Company would diminish the value of the Applications and the Intellectual Property, and would negatively impact the Company's business.

(c) The services rendered by Associate will be of a special character having a unique value to the Company.

(d) Associate desires to be engaged by the Company to perform services on behalf of the Company or its affiliates, which will place Associate in a position which allows access to Confidential Information.

**EXHIBIT B**

(e) As a condition to allowing Associate access to, or continued access to, the Confidential Information and providing, or continuing to provide, Associate with specialized training and information which is unique to the Business, Company requires Associate's agreement to the covenants in this Agreement.

**3. <u>Confidential Information</u>.**

(a) "Confidential Information" is defined as:

i. any confidential or proprietary information, observation, or data, in whatever form or medium, concerning the business or affairs of Company or any of its affiliates, including, without limitation, trading systems and methodology, concepts and strategies, records, computer software, methods of operation, financial information, business strategies, and other trade secrets or information of whatever nature;

ii. the subject matter of the Company's contemplated, applied for, or granted patents, design patents, copyrights, trade secrets, trademarks, service marks, trade names, trade dress, manuals, operating instructions, training materials, business and marketing plans and other industrial property, including such information in incomplete stages of design or research and development;

iii. the Company's lists of past, existing or potential clients, customers, members, partners, stockholders, and investors;

iv. any other information or documents which the Company reasonably regards as being confidential.

v. "Confidential Information" shall not include any information Associate can conclusively establish was known to Associate prior to engagement by the Company or its affiliates, or any information which is in the public domain through no fault of Associate.

(b) Associate shall hold all Confidential Information in the strictest confidence and shall not, during or after the termination of his/her employment by or affiliation with the Company or its affiliates, (i) disclose or make use of the Confidential Information for any purpose whatsoever other than the performance of services to the Company or its affiliates, or (ii) disclose to any person or entity or use for Associate's account or benefit or for the account or benefit of others, directly or indirectly, any Confidential Information. Upon Company's request, Associate shall cease use of and deliver to Company all Confidential Information in tangible form that Associate may have in the Associate's possession or control.

(c) Associate agrees not to disclose any Confidential Information related to the strategies, work product or business plans of the Company to any person except other Associates or employees in Associate's work group, persons specifically designated by management staff or members of the management staff.

(d) Associate shall not improperly use or disclose any Confidential Information or trade secrets, if any, of any person or entity to whom Associate has an obligation of confidentiality, and will not bring onto the premises of the Company or any of its affiliates any unpublished documents or any property belonging to any other

person or entity to whom Associate has an obligation of confidentiality unless consented to in writing by that person or entity.

(e) Company employees, contractors, and consultants may disclose trade secrets in confidence, either directly or indirectly, to a Federal, State, or local government official, or to an attorney, solely for the purpose of reporting or investigating a reasonably suspected violation of law, or in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, Company employees, contractors, and consultants who file retaliation lawsuits for reporting a reasonably suspected violation of law may disclose related trade secrets to their attorney and use them in related court proceedings, as long as the individual files documents containing the trade secrets under seal and does not otherwise disclose such trade secrets except pursuant to court order.

(f) Nothing herein is intended to be or will be construed to prevent, impede, or interfere with an employee's right to respond accurately and fully to any question, inquiry, or request for information regarding the Company or his or her employment with the Company when required by legal process, or from initiating communications directly with (in the case of a "whistleblower" action), or responding to any inquiry from, or providing truthful testimony and information to, any Federal, State, or other regulatory authority in the course of an investigation or proceeding authorized by law and carried out by such agency.

4. **Ownership of Developments**.

(a) All ideas, inventions, trademarks, and other developments or improvements conceived or developed by Associate, alone or with others, during the period of employment by or affiliation with the Company or its affiliates, whether or not during working hours, that are within the scope of the business operations of the Company or its affiliates, or that relate to any work or projects of the Company or its affiliates, shall be conclusively presumed to have been created for or on behalf of the Company as part of the Associate's services to the Company or its affiliates ("Developments"). Associate shall disclose promptly to Company any and all such Developments and assist Company, at Company's expense, in every proper way to secure Company's rights in such Developments and any copyrights, patents, trademarks, or other rights relating thereto. This Section 4(a) does not apply to any invention for which no equipment, supplies, facility, trade secret or Confidential Information of the Company was used and which was developed entirely on Associate's own time unless: (1) the invention relates (a) to the business of the Company or its affiliates, or (b) to the actual demonstrably anticipated research or development of the Company or its affiliates, or (2) the invention results from any work performed by the Associate for the Company or its affiliates.

(b) Associate understands that his or her duties at the Company or its affiliates may include the preparation of materials, including written or graphic materials and other Developments, and that any such materials conceived or written by him or her shall be done as "work made for hire" as defined and used in the Federal Copyright Act, 17 U.S.C. § 101, on behalf of the Company and shall become part of the Confidential Information. Associate hereby assigns to Company or its nominee all rights to such work and all Developments and agrees to execute, acknowledge and deliver to Company promptly and without charge to Company such written instruments and do such other acts as may be necessary in Company's opinion, to obtain and maintain title of such works or Developments to Company, as Company directs.

5. **Non-Solicitation**. Associate agrees that, during the period of employment or affiliation with the Company and for a period of twelve (12) months thereafter, whether such termination of employment or affiliation is voluntary or involuntary, Associate shall not, without Company's prior written consent, (i) solicit for employment, employ or enter into any joint venture, independent contractor or other business relationship with any other Associate or contractor of Company or its affiliates; or (ii) persuade or attempt to persuade any such Associate or contractor to terminate or modify his or her relationship with Company and/or its affiliates.

6. **Non-Competition**. In order to protect the Company's confidential and trade secret information, Associate agrees and stipulates that, for a period not to exceed twelve (12) months ("Non-Competition Period") following the termination of Associate's employment or affiliation for any reason, Associate will not engage, individually or through any entity whatsoever, directly or indirectly in providing trading, development or consulting services of any kind to any individual or entity engaged in the financial industry. Associate acknowledges and agrees that the Company's business is global in nature and is subject to irreparable harm as a result of Associate's breach of this obligation.

The Associate will be notified of the length of the Non-Competition Period within 20 (twenty) business days following the termination of employment or affiliation. The Company agrees to compensate Associate during the Non-Competition Period at a rate equal to the Associate's base monthly salary. Associate will receive compensation during the Non-Competition Period provided Associate does not breach any terms or obligations contained in the Agreement. Compensation during this Non-Competition Period will be paid on normally scheduled pay dates. The Company shall have no further payment obligations to Associate beyond the length of the Non-Competition period.

7. **Post-Employment Obligation.** For a period of twelve (12) months following Associate's date of termination, whether such termination is voluntary or involuntary, Associate agrees not to enter into any joint venture, independent contractor or other business relationship related to the electronic trading of securities, commodities and other financial instruments with any Associate of the Company who was employed or otherwise engaged by the Company at any point in the eighteen (18) months prior to the Associate's termination without the Company's prior written consent.

8. **Conflicts of Interest.** Associate represents and warrants to Company that he or she (i) does not have any relationship with any third party which would present a conflict of interest with the Associate's provision of services to the Company or any of its affiliates or present any opportunity for the disclosure of any Confidential Information, (ii) is not currently subject to a non-compete, non-solicitation or other restrictive covenant or obligation with a former employer or other third party entity, and (iii) does not currently and will not during the term of Associate's engagement by the Company, trade any products or derivatives of any products traded by the Company on behalf of any account other than that of the Company or its affiliates at any time without the written consent of an officer of the Company.

9. **Termination of Employment**. We may terminate your employment with or without cause upon written notice to you. You may terminate your employment with

us with or without cause upon the written notice of (each the applicable "Notice Period"):

(a) Thirty (30) days for associates in administrative and accounting departments, traders in the Discretionary Trading Group, or

(b) Sixty (60) days for all other associates.

We may decrease the length of the applicable Notice Period in our sole discretion upon written notice to you. You will be paid at your regular salary or draw rate and continue to receive employee benefits during the Notice Period, however you must use any and all accrued leave and will not accrue any further paid time off during the Notice Period. During the Notice Period, we reserve the right to restrict your access to our offices, trading platforms, email and other electronic communication systems, and to our confidential and proprietary information. Further, during the Notice Period you will not bind, attempt to bind, or otherwise obligate us to any third party and shall not incur any business expenses unless preapproved in writing. You understand and agree that your employment is *at-will* and that this Agreement is **not** a guarantee of continued employment for any period.

10. **Representations and Warranties.** Associate warrants and represents that Associate:

(a) is familiar with the trade secret and confidentiality terms contained in this Agreement;

(b) has concluded that his, her or its obligations and the Company's rights and remedies described in this Agreement, including, without limitation, the right to equitable relief, are reasonable;

(c) is fully aware of the duties, responsibilities, obligations and liabilities imposed upon him, her or it by this Agreement; and

(d) acknowledges that the covenants and restrictions contained in this Agreement are fair, reasonable, and just, under the circumstances.

11. **Remedies.** If Associate breaches, or threatens to commit a breach of, any of the terms of this Agreement, Company shall have the following rights and remedies, each of which rights and remedies shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to Company under law or in equity: (i) the right and remedy to have this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to Company and that money damages alone may not prove adequate remedy to Company; and (ii) the right and remedy to require Associate to account for and pay over to Company all compensation, profits, monies, accruals, increments or other benefits derived or received by Associate as the result of any transactions constituting a breach of this Agreement. Associate shall reimburse Company for all reasonable attorneys' fees, costs and expenses incurred by Company in enforcing this Agreement.

12. **Survival and Tolling**. The provisions of this Agreement which expressly or by their nature survive expiration or termination of this Agreement, including, without

limitation, Sections 10 and 11, will remain in effect after the expiration or termination of this Agreement. The non-competition, non-disclosure and non-solicitation obligations contained herein shall be extended by the length of time during which Associate shall have been in breach of any of said provisions.

13. **Release**. NEITHER COMPANY NOR ANY OF ITS MEMBERS OR AFFILIATES SHALL BE LIABLE ON ANY CLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH ASSOCIATE'S UNAUTHORIZED USE OF ANY OF THE CONFIDENTIAL INFORMATION. ASSOCIATE SPECIFICALLY DISCLAIMS AND WAIVES ANY RIGHT TO PURSUE ANY CLAIM AGAINST COMPANY OR ANY OF ITS AFFILIATES FOR ANY LOSSES OR OTHER DAMAGES INCURRED OR SUFFERED IN CONNECTION WITH OR AS A RESULT OF THE UNAUTHORIZED USE OF THE CONFIDENTIAL INFORMATION. COMPANY MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE CONFIDENTIAL INFORMATION, INCLUDING NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

14. **Construction and Severability.** This Agreement will not be enforced by the Company in the event such enforcement would be contrary to applicable law. Whenever there is any conflict between any provision of this Agreement and any material present or future law, statute, governmental rule, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but in such event, the parties desire that the effective provisions of this Agreement shall be curtailed and restricted only to the extent necessary to bring them within the legal requirements and then enforced, and the remainder of this Agreement shall not be affected. If any provision of this Agreement is held by a court to be invalid, void, or unenforceable and the court does not elect to reduce such provision, this Agreement shall be deemed amended to delete such provision or portion adjudicated to be invalid or unenforceable without in any way affecting the remaining parts of this Agreement, such amendment to apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

15. **Entire Agreement; Amendment; Waiver; Assignment**. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter contained herein. Unless otherwise specified herein, this Agreement may not be modified or amended except in a writing signed by the Company. No waiver of any breach of this Agreement shall be effective unless it is in a writing signed by the Company. Any waiver of any breach of any provision of this Agreement shall not be a waiver of any subsequent breach of the same or of any other provision of this Agreement. This Agreement may not be assigned or transferred by Associate.

16. **Governing Law.** This Agreement and any controversy arising hereunder shall be governed by, construed and enforced in accordance with the internal laws of the State of Illinois without regard to the conflict of laws principles thereof. Moreover, any legal action concerning the enforcement or interpretation of this Agreement or relating in any way to the relationship between the parties shall be instituted in a state or federal court in the County of Cook, State of Illinois and such venue shall be deemed appropriate by agreement of the parties.

***[NEXT PAGE IS SIGNATURE PAGE]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date written above.

| | |
|---|---|
| GENEVA TRADING USA, LLC | ASSOCIATE: |
| By: [signature] | Print Name: John Arens |
| Title: PRESIDENT & CEO | Signed: [signature] |
| Date: 8/5/2022 | Date: 8/11/2022 |

akerman

Jeannil D. Boji

Akerman LLP
71 South Wacker Drive
47th Floor
Chicago, IL 60606

T: 312 634 5747
F: 312 424 1900

October 8, 2026

**VIA EMAIL AND EXPRESS MAIL**
John Arens
917 Leah Drive
Cary, IL 60013
john.w.arens@gmail.com

**Re: Notice of Breach of Restrictive Covenants Agreement, Violations of Federal and State Law, and Demand for Immediate Action**

Dear Mr. Arens:

This firm represents Geneva Trading USA, LLC ("Geneva"). We write concerning your theft of Geneva's source code, trade secrets, and confidential and proprietary information preceding the end of your employment, and your deliberate efforts to conceal that theft. This letter constitutes a formal demand that you **immediately cease and desist from any further use, disclosure, transmission, retention, or access of any kind involving Geneva's property, and that you comply, or agree in writing to comply as soon as practicable, with each of the demands set forth below by no later than Friday, October 9, 2026 at 4:00 p.m. Central Time**. If you fail to do so, Geneva will have no choice but to pursue immediate legal action against you, including an application for a temporary restraining order and preliminary injunction, expedited discovery, and forensic inspection of your devices and accounts, together with claims for damages, disgorgement, exemplary damages, and attorneys' fees.

## I. Your Misconduct and Data Theft

As you know, Geneva employed you as a Senior FPGA Engineer in its Chicago office pursuant to an offer letter dated August 4, 2022, which you accepted on August 11, 2022. In that role you were entrusted with Geneva's most valuable and closely guarded assets: its proprietary trading software, source code, hardware designs, trading strategies, and related intellectual property. Your employment was expressly conditioned upon your execution of, and compliance with, a Restrictive Covenants Agreement (the "RCA") which you signed on August 11, 2022 (enclosed herewith) and Geneva's policies, including its Employee Handbook. You signed the RCA and accepted the substantial compensation and access that came with it. You then betrayed that trust by, among other things, blatantly misappropriating the very source code you were tasked with developing.

While Geneva's investigation into your misconduct is ongoing, Geneva has recently discovered that, prior to the end of your employment with Geneva (pursuant to your voluntary resignation which you claimed to be a retirement), you pushed, forwarded, and downloaded information from Geneva's systems to a personal email address, a personal Google Keep account, a personal GitHub



EXHIBIT C

account, and a personal USB-attached external drive which you connected to Geneva's systems without authorization or any business purpose, as well as potentially to a consumer OneDrive account you accessed.

Among the Geneva information you downloaded to a personal external drive, *on your very last day of employment*, was **Geneva's *complete FPGA codebase repository*—highly proprietary intellectual property that unequivocally belongs to Geneva and which Geneva has expended millions to develop.** This is not the only information you took, but it alone amounts to the utmost blatant and egregious data theft an employee could perpetrate on an employer. Your actions further reflect a deliberate scheme to cover your tracks and obfuscate your misconduct. Accordingly, Geneva has significant and well-founded concerns that you took its trade secrets to use for your own benefit and/or the benefit of a competitor, and that you have used or disclosed its proprietary information, or intend to do so. Geneva has been required to expend resources investigating, containing, and remediating this exposure, and that work continues.

## II. Your Breaches of the Restrictive Covenants Agreement and Federal and State Law

Your conduct undoubtedly breaches your contractual obligations to Geneva in multiple, independent respects. The FPGA source code repository and other information you took fall squarely within the RCA's definition of Confidential Information, which expressly encompasses confidential or proprietary information in any form or medium concerning Geneva's business or affairs, including trading systems and methodology, concepts and strategies, records, computer software, methods of operation, financial information, business strategies, other trade secrets, patents, copyrights, manuals, operating instructions, training materials, and business and marketing plans. Your breaches include, without limitation, breach of the obligation of strictest confidence, breach of the prohibition on use and disclosure, breach of the return obligation, breach of the developments and work-made-for-hire provisions, breach of the post-employment restrictive covenants, and breach of Company policy and the terms of your employment. The RCA further provides that a breach causes Geneva irreparable injury for which money damages alone may not be inadequate, and entitles Geneva to specific enforcement and injunctive relief; to an accounting for and disgorgement of any compensation, profits, monies, accruals, increments, or other benefits derived from or received as a result of your breach; and to recover its reasonable attorneys' fees, costs, and expenses. You agreed to each of those remedies. Geneva intends to enforce them.

Your conduct also violates federal and state law, and exposes you to substantial personal liability independent of your contractual obligations. The FPGA source code repository and other information you took also undoubtedly qualify as trade secrets within the meaning of the Defend Trade Secrets Act and Illinois Trade Secrets Act. Under those Acts, Geneva is entitled to injunctive relief to prevent actual and threatened misappropriation, to orders requiring affirmative acts to protect its trade secrets, and to recover its actual loss, your unjust enrichment, or in the alternative a reasonable royalty. Because your misappropriation was willful and malicious—as your deliberate selection of the highest-value branch and your post-copying coverup of your actions demonstrate—Geneva will seek exemplary damages of up to twice the amount of its damages, together with its attorneys' fees. Geneva further expressly reserves all claims available to it under the Computer Fraud and Abuse Act, including claims arising from unauthorized access, from exceeding authorized access to protected files, folders, systems, or credentials that were off-limits to you, from access occurring after your authorization was revoked, from circumvention of access

controls, and from the damage and loss Geneva has sustained in investigating, containing, and remediating your conduct. Geneva will assert such claims to the full extent supported by the forensic evidence, including evidence developed through the inspection and discovery it intends to pursue.

Moreover, as a senior engineer entrusted with Geneva's most sensitive intellectual property, you owed Geneva a duty of loyalty and fiduciary duties. Taking Geneva's source code to personal media while still employed, and concealing that taking, breached those duties. Your conduct may also give rise to, among other things, claims for conversion, trespass, unfair competition, unjust enrichment, civil liability under applicable Illinois statutes governing the theft and misuse of property and computer systems, spoliation or concealment related relief and sanctions arising from your destruction of evidence, Stored Communications Act violations, and other federal or state statutory violations, to the extent the continuing investigation confirms the elements of such claims.

**III. Demands**

Accordingly, Geneva demands that you comply, or agree in writing to comply as soon as practicable, with each of the following demands, in full, no later than **Friday, October 9, 2026 at 4:00 p.m. Central Time** (the "Deadline").

1. Cease and desist immediately. Immediately and permanently cease and desist from any use, disclosure, transmission, publication, copying, transfer, access, or exploitation of any Geneva confidential information, trade secret, source code, software, data, credential, or other property, for any purpose whatsoever, whether for your own benefit or the benefit of any other person or entity.

2. Return all Geneva property and information. Return to Geneva, through the undersigned, all Geneva confidential information, trade secrets, proprietary data, source code, documents, files, and property, in any form or medium, in your possession, custody, or control—including all originals, copies, derivatives, compilations, extracts, and work product incorporating or derived from Geneva material—without alteration.

3. Surrender all media used to store or access any Geneva information. Deliver to the undersigned and/or provide credentials for the external drive you used to take Geneva's information together with every other device, drive, disk, memory card, cloud account, repository, or storage location containing or that has ever contained Geneva material. Do not attempt to "clean," wipe, reformat, defragment, encrypt, re-image, or otherwise alter any such device or account before delivery.

4. Full accounting of locations and recipients. Identify in writing every location, account, device, drive, repository, email account, cloud service, backup, and third party to, through, or in which Geneva data was copied, stored, synchronized, transmitted, disclosed, or made available, including the dates and the materials involved. This includes, without limitation, the GitHub account and the johnarens/dotfiles repository, any personal email accounts, Google Keep, OneDrive or other consumer cloud storage, and any artificial-intelligence tools or services into which Geneva material was entered.

5. Remove or secure, without destroying. Immediately remove from public or third-party accessibility—by making private rather than deleting—any GitHub repository, cloud location, or other destination containing Geneva material, and preserve the full contents, history, logs, and metadata of each such location intact for forensic examination.

6. Sworn affidavit. Execute and deliver a sworn affidavit, in a form acceptable to Geneva, attesting under penalty of perjury that: (a) you have returned all Geneva confidential information, trade secrets, proprietary data, and property in full; (b) you have not retained any copy, in any format or medium, in any location, including personal devices, cloud accounts, external media, repositories, and email accounts; (c) you have not used, disclosed, transmitted, uploaded, or otherwise made available any Geneva confidential information to any third party; (d) you have identified all Geneva material you copied or took and every location at which, and every person and entity to whom, Geneva material was copied, stored, transmitted, or disclosed; and (e) you have not destroyed, altered, wiped, encrypted, or concealed any Geneva material or any evidence relating to the conduct described in this letter. To the extent you have disclosed or transmitted any Geneva information to any third party, the affidavit shall also confirm your agreement to cooperate with and actively assist in any remediation efforts.

7. Consent to forensic inspection. Consent in writing to forensic inspection and imaging, at your expense, by a forensic examiner engaged by Geneva for that purpose, of any personal device, computer, mobile device, external media, repository, or account used to store, access, or transmit Geneva material, and all such devices and accounts used by you from March 1, 2026 to the present.

8. Cease all violations of the Restrictive Covenants Agreement. Immediately cease any ongoing violation of the RCA, including any use or disclosure of Geneva confidential information or trade secrets, any competitive use of Geneva material, and any conduct violating your non-solicitation and non-competition obligations as those obligations apply to you.

9. Disclose all employment, engagements, and related discussions since March 1, 2026. Identify in writing any employer, client, business, or other relationship—whether current, prospective, or previously discussed or under discussion—in the financial services, trading, or related technology industries since March 1, 2026, together with the date on which any such relationship or communications commenced or is to commence, and your role and responsibilities.

10. Credentials and access. Confirm in writing that you have surrendered all Geneva badges, access cards, keys, tokens, and credentials; that you have not attempted to access any Geneva system, repository, or account since your separation; and that you have taken no step to retain or re-establish any such access. Identify every Geneva, GitHub, Atlassian, CME, or other credential in your possession or known to you, so that Geneva may remediate.

11. No further benefit. Make no further use of, and derive no further benefit from, Geneva's trade secrets, confidential information, source code, or intellectual property, directly or indirectly, personally or through any entity.

## IV. Litigation Hold and Preservation Obligations

You are hereby placed on formal notice that litigation involving this matter is reasonably anticipated. You are legally obligated to preserve, and must immediately preserve, all documents, communications, data, and electronically stored information that relate in any way to the subject matter of this letter. You must suspend any automatic or routine deletion, overwriting, purging, synchronization, or archiving process that could result in the loss or alteration of such material. This preservation obligation exists whether or not you agree to Geneva's demands.

Your preservation obligation extends to, without limitation: the external drive you connected to Geneva's systems and all other external media; all personal computers, laptops, workstations, mobile phones, tablets, and other devices; the GitHub account and the johnarens/dotfiles repository, including all branches, commits, history, and logs; all personal email accounts, including the Gmail account to which you forwarded Geneva information; Google Keep, OneDrive, and any other consumer cloud storage or note-taking service; shell and command histories; Git logs and repository metadata; file system metadata, including creation, access, and modification timestamps; browser histories, downloads, and caches; messaging applications, including text messaging and any personal messaging platforms; any artificial-intelligence tools or services used; and all communications with any current, prospective, or former employer, recruiter, competitor, or other third party concerning Geneva, your departure, or any Geneva material.

You must not delete, destroy, wipe, reformat, encrypt, re-image, alter, or modify any such material or device, and must not take any step that alters metadata, prior to forensic preservation. Geneva is already in possession of evidence that you deleted data in an effort to obscure your conduct. Any further destruction or alteration will be pursued aggressively, and Geneva will seek all available sanctions and adverse inferences, as well as any available criminal referral.

## V. Reservation of Rights

Geneva reserves all rights, claims, remedies, and defenses available to it at law, in equity, or under contract, all of which are expressly reserved. Nothing in this letter waives any right or remedy of Geneva, and no delay, forbearance, or course of conduct shall constitute a waiver. This letter is not a complete statement of the facts, of Geneva's claims, or of the relief Geneva will seek, and Geneva reserves the right to supplement and amend its positions as its investigation continues. Geneva further reserves the right to pursue claims against any third party that has received, used, or benefited from Geneva's misappropriated information.

Be advised that Geneva has instructed this firm to prepare an emergency application for injunctive relief. If you do not comply, or agree in writing to comply as soon as practicable, with each demand set forth above by the Deadline, or if Geneva deems it necessary to protect its information and business interests, Geneva will file suit without further notice to you and will seek a temporary restraining order, a preliminary and permanent injunction, expedited discovery, immediate forensic inspection and imaging, the return of its materials, compensatory and exemplary damages, disgorgement, and its attorneys' fees, costs, and expenses. Geneva will also consider all other avenues available to it, including referral to appropriate authorities.

Govern yourself accordingly. If you are represented by counsel, direct your counsel to contact the undersigned immediately. If you are not represented, we strongly suggest that you retain counsel without delay.

Very truly yours,

Jeannil Boji

Encl: Restrictive Covenants Agreement executed August 11, 2022

**GENEVA TRADING USA, LLC**
**RESTRICTIVE COVENANTS AGREEMENT**

**THIS AGREEMENT BETWEEN THE UNDERSIGNED ("ASSOCIATE") AND GENEVA TRADING USA, LLC ("COMPANY") IS IN CONSIDERATION OF ASSOCIATE'S AFFILIATION WITH THE COMPANY. ASSOCIATE UNDERSTANDS THAT WHILE HIS OR HER AFFILIATION MAY BE TERMINATED AT WILL BY EITHER THE ASSOCIATE OR THE COMPANY, THIS AGREEMENT SHALL SURVIVE TERMINATION OF SUCH AFFILIATION. THE PARTIES AGREE THAT FOR PURPOSES OF THIS AGREEMENT "COMPANY" SHALL BE DEEMED TO INCLUDE ANY PARENT, SUBSIDIARY OR AFFILIATE OF THE COMPANY. THE PARTIES FURTHER AGREE THAT "ASSOCIATE" MEANS ANY NATURAL PERSON WORKING AT THE COMPANY IN THE CAPACITY OF (i) TRADER, (ii) NON-TRADER (iii) MEMBER OF THE COMPANY OR ITS AFFILIATE WHO IS ENGAGED IN TRADING OR (iv) IN ANY OTHER CAPACITY AS AN EMPLOYEE OR NON-EMPLOYEE CONSULTANT.**

1. **Effective Date.** This Agreement is effective as of the Associate's start date. Specific obligations under this Agreement shall continue after the date on which the Associate may cease to be employed by or otherwise affiliated or associated with the Company when necessary to carry out the intent of this Agreement.

2. **Acknowledgments**. Associate acknowledges that:

(a) Company is engaged in the business of developing software, trading platforms, strategies, and other intellectual property related to the trading and support as well as the active trading, directly and indirectly, of futures, securities, commodities, and other financial instruments ("Business"). The Business is specialized and any documents and information regarding the Confidential Information (as defined below) are highly confidential and constitute trade secrets.

(b) Company owns proprietary, trade secret trading software applications (the "Applications"), has expended considerable time, effort and resources to acquire, develop, maintain and protect the Applications and unique trade secret trading strategies, related technology techniques, and relationships, (the "Intellectual Property"), and may trade using the Intellectual Property electronically on exchanges globally. The Applications and Intellectual Property provide the Company with a competitive advantage and are not generally available to the public or known within the trading industry. The Parties acknowledge and agree that the success of the Company depends on the Applications, Company source code, and Intellectual Property remaining proprietary and confidential, and that disclosure of the Intellectual Property, the unique features of the Applications, or other confidential information of the Company would diminish the value of the Applications and the Intellectual Property, and would negatively impact the Company's business.

(c) The services rendered by Associate will be of a special character having a unique value to the Company.

(d) Associate desires to be engaged by the Company to perform services on behalf of the Company or its affiliates, which will place Associate in a position which allows access to Confidential Information.

(e) As a condition to allowing Associate access to, or continued access to, the Confidential Information and providing, or continuing to provide, Associate with specialized training and information which is unique to the Business, Company requires Associate's agreement to the covenants in this Agreement.

**3. Confidential Information.**

(a) "Confidential Information" is defined as:

i. any confidential or proprietary information, observation, or data, in whatever form or medium, concerning the business or affairs of Company or any of its affiliates, including, without limitation, trading systems and methodology, concepts and strategies, records, computer software, methods of operation, financial information, business strategies, and other trade secrets or information of whatever nature;

ii. the subject matter of the Company's contemplated, applied for, or granted patents, design patents, copyrights, trade secrets, trademarks, service marks, trade names, trade dress, manuals, operating instructions, training materials, business and marketing plans and other industrial property, including such information in incomplete stages of design or research and development;

iii. the Company's lists of past, existing or potential clients, customers, members, partners, stockholders, and investors;

iv. any other information or documents which the Company reasonably regards as being confidential.

v. "Confidential Information" shall not include any information Associate can conclusively establish was known to Associate prior to engagement by the Company or its affiliates, or any information which is in the public domain through no fault of Associate.

(b) Associate shall hold all Confidential Information in the strictest confidence and shall not, during or after the termination of his/her employment by or affiliation with the Company or its affiliates, (i) disclose or make use of the Confidential Information for any purpose whatsoever other than the performance of services to the Company or its affiliates, or (ii) disclose to any person or entity or use for Associate's account or benefit or for the account or benefit of others, directly or indirectly, any Confidential Information. Upon Company's request, Associate shall cease use of and deliver to Company all Confidential Information in tangible form that Associate may have in the Associate's possession or control.

(c) Associate agrees not to disclose any Confidential Information related to the strategies, work product or business plans of the Company to any person except other Associates or employees in Associate's work group, persons specifically designated by management staff or members of the management staff.

(d) Associate shall not improperly use or disclose any Confidential Information or trade secrets, if any, of any person or entity to whom Associate has an obligation of confidentiality, and will not bring onto the premises of the Company or any of its affiliates any unpublished documents or any property belonging to any other

person or entity to whom Associate has an obligation of confidentiality unless consented to in writing by that person or entity.

(e) Company employees, contractors, and consultants may disclose trade secrets in confidence, either directly or indirectly, to a Federal, State, or local government official, or to an attorney, solely for the purpose of reporting or investigating a reasonably suspected violation of law, or in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, Company employees, contractors, and consultants who file retaliation lawsuits for reporting a reasonably suspected violation of law may disclose related trade secrets to their attorney and use them in related court proceedings, as long as the individual files documents containing the trade secrets under seal and does not otherwise disclose such trade secrets except pursuant to court order.

(f) Nothing herein is intended to be or will be construed to prevent, impede, or interfere with an employee's right to respond accurately and fully to any question, inquiry, or request for information regarding the Company or his or her employment with the Company when required by legal process, or from initiating communications directly with (in the case of a "whistleblower" action), or responding to any inquiry from, or providing truthful testimony and information to, any Federal, State, or other regulatory authority in the course of an investigation or proceeding authorized by law and carried out by such agency.

4. **Ownership of Developments**.

(a) All ideas, inventions, trademarks, and other developments or improvements conceived or developed by Associate, alone or with others, during the period of employment by or affiliation with the Company or its affiliates, whether or not during working hours, that are within the scope of the business operations of the Company or its affiliates, or that relate to any work or projects of the Company or its affiliates, shall be conclusively presumed to have been created for or on behalf of the Company as part of the Associate's services to the Company or its affiliates ("Developments"). Associate shall disclose promptly to Company any and all such Developments and assist Company, at Company's expense, in every proper way to secure Company's rights in such Developments and any copyrights, patents, trademarks, or other rights relating thereto. This Section 4(a) does not apply to any invention for which no equipment, supplies, facility, trade secret or Confidential Information of the Company was used and which was developed entirely on Associate's own time unless: (1) the invention relates (a) to the business of the Company or its affiliates, or (b) to the actual demonstrably anticipated research or development of the Company or its affiliates, or (2) the invention results from any work performed by the Associate for the Company or its affiliates.

(b) Associate understands that his or her duties at the Company or its affiliates may include the preparation of materials, including written or graphic materials and other Developments, and that any such materials conceived or written by him or her shall be done as "work made for hire" as defined and used in the Federal Copyright Act, 17 U.S.C. § 101, on behalf of the Company and shall become part of the Confidential Information. Associate hereby assigns to Company or its nominee all rights to such work and all Developments and agrees to execute, acknowledge and deliver to Company promptly and without charge to Company such written instruments and do such other acts as may be necessary in Company's opinion, to obtain and maintain title of such works or Developments to Company, as Company directs.

5. **Non-Solicitation**. Associate agrees that, during the period of employment or affiliation with the Company and for a period of twelve (12) months thereafter, whether such termination of employment or affiliation is voluntary or involuntary, Associate shall not, without Company's prior written consent, (i) solicit for employment, employ or enter into any joint venture, independent contractor or other business relationship with any other Associate or contractor of Company or its affiliates; or (ii) persuade or attempt to persuade any such Associate or contractor to terminate or modify his or her relationship with Company and/or its affiliates.

6. **Non-Competition**. In order to protect the Company's confidential and trade secret information, Associate agrees and stipulates that, for a period not to exceed twelve (12) months ("Non-Competition Period") following the termination of Associate's employment or affiliation for any reason, Associate will not engage, individually or through any entity whatsoever, directly or indirectly in providing trading, development or consulting services of any kind to any individual or entity engaged in the financial industry. Associate acknowledges and agrees that the Company's business is global in nature and is subject to irreparable harm as a result of Associate's breach of this obligation.

The Associate will be notified of the length of the Non-Competition Period within 20 (twenty) business days following the termination of employment or affiliation. The Company agrees to compensate Associate during the Non-Competition Period at a rate equal to the Associate's base monthly salary. Associate will receive compensation during the Non-Competition Period provided Associate does not breach any terms or obligations contained in the Agreement. Compensation during this Non-Competition Period will be paid on normally scheduled pay dates. The Company shall have no further payment obligations to Associate beyond the length of the Non-Competition period.

7. **Post-Employment Obligation.** For a period of twelve (12) months following Associate's date of termination, whether such termination is voluntary or involuntary, Associate agrees not to enter into any joint venture, independent contractor or other business relationship related to the electronic trading of securities, commodities and other financial instruments with any Associate of the Company who was employed or otherwise engaged by the Company at any point in the eighteen (18) months prior to the Associate's termination without the Company's prior written consent.

8. **Conflicts of Interest.** Associate represents and warrants to Company that he or she (i) does not have any relationship with any third party which would present a conflict of interest with the Associate's provision of services to the Company or any of its affiliates or present any opportunity for the disclosure of any Confidential Information, (ii) is not currently subject to a non-compete, non-solicitation or other restrictive covenant or obligation with a former employer or other third party entity, and (iii) does not currently and will not during the term of Associate's engagement by the Company, trade any products or derivatives of any products traded by the Company on behalf of any account other than that of the Company or its affiliates at any time without the written consent of an officer of the Company.

9. **Termination of Employment**. We may terminate your employment with or without cause upon written notice to you. You may terminate your employment with

us with or without cause upon the written notice of (each the applicable "Notice Period"):

(a) Thirty (30) days for associates in administrative and accounting departments, traders in the Discretionary Trading Group, or

(b) Sixty (60) days for all other associates.

We may decrease the length of the applicable Notice Period in our sole discretion upon written notice to you. You will be paid at your regular salary or draw rate and continue to receive employee benefits during the Notice Period, however you must use any and all accrued leave and will not accrue any further paid time off during the Notice Period. During the Notice Period, we reserve the right to restrict your access to our offices, trading platforms, email and other electronic communication systems, and to our confidential and proprietary information. Further, during the Notice Period you will not bind, attempt to bind, or otherwise obligate us to any third party and shall not incur any business expenses unless preapproved in writing. You understand and agree that your employment is *at-will* and that this Agreement is **not** a guarantee of continued employment for any period.

10. **Representations and Warranties.** Associate warrants and represents that Associate:

(a) is familiar with the trade secret and confidentiality terms contained in this Agreement;

(b) has concluded that his, her or its obligations and the Company's rights and remedies described in this Agreement, including, without limitation, the right to equitable relief, are reasonable;

(c) is fully aware of the duties, responsibilities, obligations and liabilities imposed upon him, her or it by this Agreement; and

(d) acknowledges that the covenants and restrictions contained in this Agreement are fair, reasonable, and just, under the circumstances.

11. **Remedies.** If Associate breaches, or threatens to commit a breach of, any of the terms of this Agreement, Company shall have the following rights and remedies, each of which rights and remedies shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to Company under law or in equity: (i) the right and remedy to have this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to Company and that money damages alone may not prove adequate remedy to Company; and (ii) the right and remedy to require Associate to account for and pay over to Company all compensation, profits, monies, accruals, increments or other benefits derived or received by Associate as the result of any transactions constituting a breach of this Agreement. Associate shall reimburse Company for all reasonable attorneys' fees, costs and expenses incurred by Company in enforcing this Agreement.

12. **Survival and Tolling.** The provisions of this Agreement which expressly or by their nature survive expiration or termination of this Agreement, including, without

limitation, Sections 10 and 11, will remain in effect after the expiration or termination of this Agreement. The non-competition, non-disclosure and non-solicitation obligations contained herein shall be extended by the length of time during which Associate shall have been in breach of any of said provisions.

13. **Release**. NEITHER COMPANY NOR ANY OF ITS MEMBERS OR AFFILIATES SHALL BE LIABLE ON ANY CLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH ASSOCIATE'S UNAUTHORIZED USE OF ANY OF THE CONFIDENTIAL INFORMATION. ASSOCIATE SPECIFICALLY DISCLAIMS AND WAIVES ANY RIGHT TO PURSUE ANY CLAIM AGAINST COMPANY OR ANY OF ITS AFFILIATES FOR ANY LOSSES OR OTHER DAMAGES INCURRED OR SUFFERED IN CONNECTION WITH OR AS A RESULT OF THE UNAUTHORIZED USE OF THE CONFIDENTIAL INFORMATION. COMPANY MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE CONFIDENTIAL INFORMATION, INCLUDING NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

14. **Construction and Severability.** This Agreement will not be enforced by the Company in the event such enforcement would be contrary to applicable law. Whenever there is any conflict between any provision of this Agreement and any material present or future law, statute, governmental rule, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but in such event, the parties desire that the effective provisions of this Agreement shall be curtailed and restricted only to the extent necessary to bring them within the legal requirements and then enforced, and the remainder of this Agreement shall not be affected. If any provision of this Agreement is held by a court to be invalid, void, or unenforceable and the court does not elect to reduce such provision, this Agreement shall be deemed amended to delete such provision or portion adjudicated to be invalid or unenforceable without in any way affecting the remaining parts of this Agreement, such amendment to apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

15. **Entire Agreement; Amendment; Waiver; Assignment**. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter contained herein. Unless otherwise specified herein, this Agreement may not be modified or amended except in a writing signed by the Company. No waiver of any breach of this Agreement shall be effective unless it is in a writing signed by the Company. Any waiver of any breach of any provision of this Agreement shall not be a waiver of any subsequent breach of the same or of any other provision of this Agreement. This Agreement may not be assigned or transferred by Associate.

16. **Governing Law.** This Agreement and any controversy arising hereunder shall be governed by, construed and enforced in accordance with the internal laws of the State of Illinois without regard to the conflict of laws principles thereof. Moreover, any legal action concerning the enforcement or interpretation of this Agreement or relating in any way to the relationship between the parties shall be instituted in a state or federal court in the County of Cook, State of Illinois and such venue shall be deemed appropriate by agreement of the parties.

***[NEXT PAGE IS SIGNATURE PAGE]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date written above.

GENEVA TRADING USA, LLC

By: ______________________

Title: PRESIDENT & CEO

Date: 8/5/2022

ASSOCIATE:

Print Name: John Arens

Signed: ______________________

Date: 8/11/2022